**The STATE of Texas, Appellant,**

v.

**Lionel SIMPSON, Appellee.**

**No. 12–00–00235–CR.**

Court of Appeals of Texas, Tyler.

April 23, 2003.

case of Lionel Simpson ("Appellee"). Appellee was indicted for capital murder. He was a juvenile at the time of the offense. The trial court granted Appellee's motion to suppress his confession because the authorities violated section 52.02(b) of the Texas Family Code by not promptly notifying Appellee's parents of his detention. We concluded that the evidence supported the trial court's decision that Appellee's confession was illegally obtained. Based on this conclusion, we affirmed the judgment of the trial court. *State v. Simpson*, 51 S.W.3d 633 (Tex.App.-Tyler 2000).

On petition for discretionary review, the State argued that no causal connection exists between the failure to notify Appellee's parents and the confession subsequently obtained from Appellee. The court of criminal appeals vacated our judgment and remanded the appeal to us for consideration of this issue, in light of its recent opinion in *Gonzales v. State*, 67 S.W.3d 910 (Tex.Crim.App.2002). *State v. Simpson*, 74 S.W.3d 408 (Tex.Crim.App. 2002)(per curiam). Consistent with *Gonzales*, we affirm the trial court's suppression of Appellee's confession.

### BACKGROUND

Appellee and his brother, Danielle, were arrested at 11:00 a.m. on Friday, January 28, 2000, in connection with an investigation of the murder of an elderly retired school teacher, Geraldine Davidson. Appellee was fifteen years of age at the time. Prior to interviewing Appellee, law enforcement investigators took him before Justice of the Peace James Todd. At 12:25 p.m., Judge Todd gave Appellee a comprehensive magistrate's juvenile warning, outside the presence of law enforcement officers, pursuant to section 51.095 of the Family Code.[1] Judge Todd testified that

Douglas E. Lowe, Dist. Atty's Office, Palestine, for State.

William M. House Jr., Palestine, for appellee.

Panel consisted of WORTHEN, C.J., and GRIFFITH, J.

### OPINION

SAM GRIFFITH, Justice.

On original submission to this court, we addressed the State's appeal from the granting of a motion to suppress in the

1. Judge Todd read and explained the following rights and warnings to Simpson:

Appellee understood his rights, including his right to an attorney, and voluntarily relinquished them.

Appellee was then interviewed by Texas Ranger Rudy Flores. Flores testified Appellee was relaxed and cooperative as he answered questions. He was provided lunch, food, soda pop and restroom breaks during the interview. Flores' interview of Appellee, however, lasted for seven and one-half hours, culminating in a written statement by Appellee in his own handwriting implicating himself in the murder. Before signing the statement, Appellee was again taken before Judge Todd.

Judge Todd gave Appellee a second magistrate's juvenile warning[2] at approximately 8:15 p.m. As with the first warning, the second warning was given outside the presence of the law enforcement officers. Judge Todd then reviewed Appellee's written statement and advised him he was under no obligation to make or sign the statement. Appellee nevertheless proceeded to sign the statement, initialing each page. Appellee remained in the juvenile detention center through the weekend.

From the time of his arrest on Friday, January 28, 2000, until Sunday evening, January 30, 2000, neither Appellee's mother nor any other parent, guardian, or custodian was notified of his arrest and detention. Appellee's mother, Brenda Simpson, first learned that her son was in the juvenile detention center when a police officer served her with a juvenile petition and told her to be in court for Appellee's initial detention hearing at 9:00 a.m. on Monday, January 31, 2000. Appellee had already been detained for over forty-eight hours when the officer notified Ms. Simpson of the scheduled court hearing. However, the officer still did not tell her why Appellee was being detained.

### Standard of Review

A trial court's ruling on a motion to suppress is generally reviewed by an abuse of discretion standard. *Jackson v. State,* 33 S.W.3d 828, 838 (Tex.Crim.App. 2000); *Oles v. State,* 993 S.W.2d 103, 106 (Tex.Crim.App.1999); *Maddox v. State,* 682 S.W.2d 563, 564 (Tex.Crim.App.1985). In this case, the resolution of the issue before us does not turn on an evaluation of the credibility and demeanor of the wit-

---

1. You may remain silent and not make any statement at all;
2. Any statement that you make may be used in evidence against you;
3. You have the right to an attorney;
4. You have the right to have an attorney present to advise you before or during questioning;
5. If you are unable to employ an attorney, you have the right to have an attorney appointed for you;
6. You have the right to have the attorney counsel you before or during any interviews with peace officers or attorneys representing the state; and
7. You have the right to terminate the interview at any time.

Judge Todd also inquired whether Appellee understood these rights and whether he had any questions.

*See* Tex. Fam.Code Ann. § 51.095 (Vernon Supp.1999).

2. The second warning was as follows:
1. You may remain silent and not make any statement;
2. Any statement that you make may be used in evidence against you;
3. You have the right to an attorney;
4. You have the right to have an attorney present to advise you before or during questioning;
5. If you are unable to employ an attorney, you have the right to have an attorney appointed for you;
6. You have the right to have the attorney counsel you before or during any interviews with peace officers or attorneys representing the state; and
7. You have the right to terminate the interview at any time.

nesses, and the facts relating to the issues are undisputed. Therefore, we conduct a de novo review. *Oles,* 993 S.W.2d at 106; *see also Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997).

### SECTION 52.02(B) AND GONZALES V. STATE

Section 52.02(b) of the Family Code provides that "[a] person taking a child into custody **shall promptly** give notice of his action and a statement of the reason for taking the child into custody, to ... the child's parent, guardian, or custodian...." TEX. FAM.CODE ANN. § 52.02(b) (Vernon Supp.1999) (emphasis added). The State admits that the law enforcement officials in this case failed to promptly notify Appellee's parents that he was in custody, thus violating section 52.02(b). The State argues, however, that no causal connection exists between this violation and the confession obtained from Appellee. Therefore, the State reasons, since Appellee was properly admonished, his confession is admissible. The holding in *Gonzales v. State,* 67 S.W.3d 910 (Tex.Crim.App.2002) provides the basis for the State's argument.

The appellant in *Gonzales* was fifteen years old at the time he shot and killed a convenience store clerk. He was subsequently arrested and given *Miranda* warnings [3] en route to a designated juvenile processing center. Upon arrival, the officers took the appellant's written statement. His parents were not notified of his arrest until he was processed into the detention facility, which was five or six hours after his arrest. The appellant filed a motion to suppress his statement contending that suppression was required because his parents were not promptly notified of his arrest. The trial court denied the motion. The Houston First Court of Appeals held that the trial court erred in denying

the motion and that the statement was automatically inadmissible because the officers violated section 52.02(b). *Gonzales v. State,* 9 S.W.3d 267, 271 (Tex.App.-Houston [1st Dist.] 1999).

■ The State filed a petition for discretionary review asserting that a juvenile's written statement should not be suppressed without some showing of a causal connection between the failure to notify the juvenile's parents and the juvenile's execution of a written statement. *Id.* at 912. The court of criminal appeals granted review. In addressing the State's argument, the court first noted that in order for a juvenile's written statement to be suppressed because of a violation of section 52.02(b), there must be some exclusionary mechanism. *Id.* However, section 52.02(b) is "not an independent exclusionary statute." *Id.* Thus, a violation of this section does not make a juvenile's confession automatically inadmissible. *Id.* Family Code section 51.17 provides that Chapter 38 of the Code of Criminal Procedure applies in a judicial proceeding under Title 3 of the Family Code (the Juvenile Justice Code). TEX. FAM.CODE ANN. § 51.17(c) (Vernon Supp.2000). Consequently, if evidence is to be excluded because of a section 52.02(b) violation, it must be excluded through the operation of article 38.23(a). *Gonzales,* 67 S.W.3d at 912.

■ Article 38.23(a) provides that "no evidence obtained by an officer or other person in violation of any provision of the Constitution or laws of the State of Texas ... shall be admitted into evidence." TEX. CODE CRIM. PROC. ANN. 38.23(a) (Vernon 1987). Consistent with its previous opinion in *Comer v. State,* the court of criminal appeals stated in *Gonzales* that an exclusionary analysis under article 38.23(a)

3. *See Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

necessarily entails a causal connection analysis. *Gonzales,* 67 S.W.3d at 912–13; *Comer v. State,* 776 S.W.2d 191, 197 (Tex. Crim.App.1989). Following the reasoning in its prior decisions, the court held that a juvenile's confession is not obtained in violation of the law, and is therefore admissible under article 38.23(a), if there is no causal connection between the illegal conduct and the acquisition of the evidence. *Id.* (citations omitted). We therefore consider whether a causal connection exists between the violation of section 52.02(b) in the instant case and Appellee's confession.

### ANALYSIS

Appellee's mother, Brenda Simpson, testified at the hearing on the motion to suppress. According to Ms. Simpson's testimony, she had lived with Appellee's father, James Bolton, for thirty years and has seven children living in her household. She works at Palestine Regional Medical Center in Palestine, begins her workday at 7:00 a.m., and sometimes arrives home from work as late as 7:00 or 8:00 in the evening, "according to how the emergency room is going." Despite her early work schedule, she makes sure "everybody is at least halfway dressed [for school] before she leaves." If her children do not finish getting ready on time and miss the school bus, she leaves work and takes them to school. She testified that she and Mr. Bolton try to keep Appellee and his brother, Danielle, away from troublemakers, but admitted that both Danielle and Appellee had been in trouble before. She further testified that

> [a]nytime that someone came to me and told me that Danielle and [Appellee] was in trouble, the first thing I always do is call the police to find out why. And when they tell me that, they asked me where are my sons, I told them that they weren't at my house. I would find them and bring them to them. And

that's what I always do. Unless we're at the house and they don't want to go, I call the police and have the police come to my house. And they would come to my house and pick them up.

Ms. Simpson stated that she arrived home from work about 4:00 p.m. on January 28, 2000, and learned that Danielle had been arrested. When she arrived, Mr. Bolton was at home, "nervous and upset, worried about Danielle" and about Appellee. Neither she nor Mr. Bolton knew that Appellee had also been arrested, and she assumed he was with another brother or at a sister's house because he "would normally be with them." She admitted, however, that when Appellee was with a sister or brother, he usually called her to let her know where he was. Ms. Simpson made no effort to try to find Appellee other than talking to one of her daughters. She did not think it was unusual that Danielle was in jail on the same day that she could not find Appellee because Appellee "doesn't go to jail every time Danielle goes." She and Mr. Bolton decided they would "wait and see what was going to happen" because if Appellee was in jail, "a police officer would come by and tell [them]." Mr. Bolton was not present at the hearing, and Ms. Simpson's testimony is uncontroverted. The State introduced no evidence explaining the failure to notify Appellee's parents of his arrest or to inform them of the reason he was being detained.

Based upon our review of the record, we find nothing to persuade us that, on January 28, Ms. Simpson would not have immediately proceeded to where Appellee was detained if she had received the prompt notification required by section 52.02(b). Ms. Simpson described her efforts to care for her children. She also expressed her concern for Appellee and her distress over the arrest of Danielle. She explained that

she did not call the police to find out if Appellee had been arrested because she was so distraught and because she believed the police would let her know if Appellee had in fact been arrested. Furthermore, she had initiated contact with the police on prior occasions only after learning from another source that one or both of her sons were in trouble. According to her testimony, she always acted promptly to make certain her sons were made available to the police, but nothing in the record suggests that she had no further involvement after that point. Therefore, it is reasonable to conclude from her testimony, especially in light of the gravity of the crime of which Appellee was suspected, that if either Ms. Simpson or Mr. Bolton had received the required notice, at least one of them would have proceeded to the location where Appellee was being detained.

Moreover, we find no showing that Ms. Simpson, if she had been promptly notified, could not have reached Appellee either before he was interviewed by law enforcement or before he signed a statement. To the contrary, her testimony reveals that she works at a local hospital and can leave work when her children need her assistance. Even if she were unable to leave, however, Ms. Simpson arrived home from work at 4:00 p.m. on January 28, which was four and one-half hours prior to the time Appellee signed his statement. Furthermore, Ms. Simpson testified that Mr. Bolton was at home on the day Appellee was arrested and when she arrived home from work. Consequently, we cannot conclude that Appellee would not have had access to one or both of his parents before signing his statement if they had received the notification required by section 52.02(b).

### CONCLUSION

Appellee's statement was obtained, without notification to or the involvement of his parents, during the first nine and one-half hours of his detention, which began at 11:00 a.m. on January 28, 2000. After Appellee signed his statement, at approximately 8:30 p.m., Appellee's detention continued, and he remained isolated from his parents until the time of his juvenile hearing at 9:00 a.m. on Monday, January 31. If Appellee's parents had received the notification required by section 52.02(b), we cannot conclude that they would not have proceeded to where Appellee was detained before he gave his statement. Moreover, we do find nothing in the record to indicate that either of Appellee's parents would have advised Appellee to make or sign a statement implicating himself in the commission of capital murder. Therefore, we also cannot say with any degree of certainty, after examining the record before us, that Appellee would have still chosen to confess his crime if his parents had been promptly notified and he had access to them, and possibly to counsel. *See Comer v. State,* 776 S.W.2d 191, 197 (Tex. Crim.App.1989) (court could not say with any degree of confidence that juvenile would have confessed if, instead of being detained for three hours, he had been transported "forthwith" to juvenile facility, where he may have had access to at least his parents, if not counsel). Consequently, we hold that the trial court did not err in suppressing Appellee's confession.

The judgment of the trial court is ***affirmed.***